(121 So. 408)

**SLOSS–SHEFFIELD STEEL & IRON CO. v. CRIM.** (6 Div. 236.)

Supreme Court of Alabama.   March 28, 1929.

Bradley, Baldwin, All & White, of Birmingham, for appellant.

Stokely, Scrivner, Dominick & Smith, of Birmingham, for appellee.

BROWN, J. The sole question presented on this record is whether there is any evidence to sustain the finding and conclusion of the circuit court that Crim was an employé within the scope and meaning of the Workmen's Compensation Law (Code 1923, § 7534 et seq.).

The evidence is without conflict that Crim was first employed by the defendant in January, 1928, to do various kinds of work, for which he was paid a daily wage. This employment continued until about April 15th, when he entered into an agreement with the defendant's superintendent to engage in the work of cleaning up and putting into condition for use one of defendant's mine entries, which had not been used for about two years, and as a result of its nonuse the timbers supporting the roof were in bad condition, and falls had occurred in places covering the tram tracks that had to be cleaned up; the ties in the tramway had rotted, necessitating their removal and replacing new ties and relaying the rails. For doing this work the defendant company furnished the new timbers for propping the roof, and new ties for the tramway on which the old rails were to be replaced. Under this arrangement Crim was paid for this work on a yardage basis for dirt and rock removed, and on a tonnage basis for the coal recovered, and had authority to employ his help and fix the amount of their compensation, with the restriction that he was not to employ any of the defendant's regular employés. The work was to be done so as to put the entry in safe condition for use of defendant's employés after the work was finished. Crim's helpers were paid by the defendant out of the allowance credited to him for the work. This entry, during the progress of the work was regularly inspected by the defendant's employés in respect to its safety to the workmen from gas.

There is evidence tending to show that the help employed by Crim, consisting of not more than three at a time, lived on the defendant's premises in its houses, and that defendant furnished Crim board, which was deducted from his earnings. The evidence also tends to show that explosives used in this work were furnished by the defendant and charged to Crim's earnings. As to who furnished the tools used on the work, and the facilities for moving the dirt, rock and coal from this entry, the evidence is silent.

The witness A. W. Evans, defendant's superintendent, testified:

"My mine foreman was Robert Park. His duties were to look after the general condition of the mine. By general condition of the mine, I mean everybody on the inside was under his jurisdiction. That included Mr. Crim * * * to see that they done (did) their work right. By doing their work right, I mean workmanship right, that the ties and everything was put in properly. To see that the work was carried on properly. If he came along and saw any place necessary to timber he would tell them to do it. Then it would be the duty of the workmen to get the timber and put it in. He didn't have any regulations about setting timbers so far (apart) but under the conditions that depended on the top. The mine foreman went in there, and if in his judgment the timber ought to be set in certain places, he would direct how they were to be set. * * * Suppose the mine foreman comes in there and there is certain rock that the mine foreman thinks ought to come down, then he would, of course, direct Mr. Crim to take it down. The same way about the sides; if he saw rock falling from the sides, he would tell him he would have to put it in there.

"The mine foreman, or one of his assistants, visits the various working places in the mine every day; goes over and looks at the conditions, looks for safety, and points out any changes he desires to make for safety. We had no specifications in our agreement with Mr. Crim for how far timbers would be set apart, for that would be dependent upon the condition of the work. * * * What the mine foreman did, he would go in there to see that the work was

150

carried on properly, in order to make it safe, according to the agreement. The mine foreman was to determine if it was safe; if it wasn't he would tell me about it. * * * I would go down there and talk to him and get him back to his agreement. * * * I would make him leave if he did not come up to the contract. I was the judge whether or not he was coming up to the contract."

Robert Parks testified: "I did not have assistants to visit Mr. Crim's place; nobody but me, and I think I was in there once or twice; twice that I know of, while that entry was being completed. It was being fixed up to start work, and we had to set timbers in there. I don't believe that there was any agreement made on the timbers; just set them where they were needed. The man that had the contract determined where the timbers were needed. Suppose he did not set them where they were needed, I was to notify Mr. Evans in case anything didn't come up to contract, about the gob and the timbers, what was to be retimbered; a man naturally would not go in a bad rack without timbering it. Suppose it is not timbered properly, the duty to supervise it was supposed to be mine and Mr. Evans'. Suppose he did not set the timbers properly—well, I guess we could come to some agreement on that. If he did not timber it properly it was not my duty to see that it was done. It was supposed to be the duty of either Mr. Evans or myself. If it was not timbered properly, Mr. Evans or I were supposed to give directions how it should be done."

On this evidence the trial court reached the conclusion that Crim was an employé and not an independent contractor. The petitioner contends that this conclusion is not supported by the evidence that shows, without room for adverse inference, that Crim was an independent contractor, and not an employé.

In Ex parte W. T. Smith Lumber Co., 206 Ala. 485, 90 So. 807, this court, considering the question as to whether or not the conclusion of the trial court that the injured workman was an employé within the meaning of the Workmen's Compensation Law, was well grounded, observed:

"As to who did or did not constitute an employé under the Employers' Liability Act (Code 1907, § 3910), as construed by our former decisions, may not now be a material factor as the present act defines both an employer and employé. It says (section 36):

" 'The term "employer" as used herein shall mean every person not excluded by Section 8, who employs another to perform a service for hire and to whom the "employer" directly pays wages. * * * The terms "employé" and "workman" are used interchangeably and have the same meaning throughout this act, and shall be construed to mean

* * * (2) Every person not excluded by Section 8, in the service of another *under any contract of hire,* express or implied, oral or written, including aliens, and also including minors who are legally permitted to work under the laws of the state.' " Code of 1923, § 7596; Reed v. Ridout's Ambulance, Inc., 212 Ala. 428, 102 So. 906.

In addition to defining the terms "employer" and "employé," section 31 of the act, now section 7585 of the Code, designed to prevent fraudulent schemes, artifices, or devices to avoid application of the Workmen's Compensation Law, provides that: " * * * No person shall be deemed a contractor or subcontractor so as to make him liable to pay compensation within the meaning of this section, who performs his work upon the employer's premises, and with the employer's tools or appliances and *under the employer's directions;* nor one who does what is commonly known as 'piece work,' *or in any way where the system of employment used merely provides a method of fixing the workman's wages.*" (Italics supplied.)

Even under the common-law rule, as applied to the Employer's Liability Act by our decisions, the payment of compensation and the method adopted was regarded as a mere incident, and not a controlling element of the relation. The essentials of the relation under that rule are "the voluntary rendition of service by the employé, its acceptance by the employer, and the employer's right to direct and control the employé." Reed v. Ridout's Ambulance, Inc., supra.

Therefore, whether we apply the rule of the statute or the common law, it must be held that there was some legal evidence that sustains the conclusion of the trial court, and the writ of certiorari will be denied and the petition dismissed. Woodward Iron Co. v. Dean, 217 Ala. 530, 117 So. 52; Crescent Coal Co. v. Simmons, 217 Ala. 367, 116 So. 512; Ex parte W. T. Smith Lumber Co., 206 Ala. 485, 90 So. 807; State ex rel. Virginia Co. v. District Court St. Louis County, 128 Minn. 43, 150 N. W. 211.

Writ denied, and petition dismissed.

ANDERSON, C. J., and SAYRE and THOMAS, JJ., concur.